ROARK et al., Appellees and Cross–Appellants,

v.

RYDELL et al., Appellants and Cross–Appellees;

Airline Union's Mortgage Company, Ltd., Cross–Appellee.

[Cite as *Roark v. Rydell,* 174 Ohio App.3d 186, 2007-Ohio-6873.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–061090 and C–070032.

Decided Dec. 21, 2007.

Legal Aid Society of Southwest Ohio, Noel M. Morgan, and Jessica L. Powell, for appellees and cross-appellants.

John W. Hauck, for appellants and cross-appellees.

---

SYLVIA SIEVE HENDON, Judge.

{¶ 1} These cases began as foreclosure actions against Cynthia Roark and Steven Roark and against Danyel Jones. The Roarks and Jones ("the homeowners"), claiming to have been the victims of an elaborate "property flipping" scheme, filed third-party actions against several individuals and companies, including Ashore Funding, Inc., Clifford Rydell, Airline Union's Mortgage Company ("AUM"), and Airline Union's Mortgage Co., Ltd. ("AUMLTD").

{¶ 2} Ashore and Rydell now appeal the trial court's judgment in favor of the homeowners, and the homeowners have cross-appealed.

### Rydell and Ashore

{¶ 3} Clifford Rydell was the sole owner and president of Ashore, a mortgage lender that sold its loans on a secondary market. Rydell was also the sole owner of AUM, a licensed second-mortgage lender.

{¶ 4} Rydell had acquired AUM in 1995. At that time, Rydell testified, the value of a second-mortgage license was that its holder was exempt from Ohio's requirement for a separate mortgage-broker's license. In other words, the holder of a second-mortgage license could broker original loans without a broker's license.

{¶ 5} Between 1995 and 2001, AUM originated second mortgages and brokered first mortgages. During that period, AUM earned far more from its brokered mortgages than from its second-mortgage accounts.

{¶ 6} In August 2001, Rydell met Jay Sullivan and Troy Clements. Sullivan told Rydell that Clements was "a big investor that he was starting to get some business from" and that Clements was going to lend him some money to acquire office space.

{¶ 7} After Rydell had hired Sullivan as a loan officer for AUM, Sullivan "brought in a lot of business." Between August and December 2001, Sullivan brokered 415 loans, which generated $1.6 million in fees.

{¶ 8} On August 29, 2001, Rydell and Sullivan entered into an agreement that would become effective on January 1, 2002. Under the agreement, Rydell established an AUM branch office on Kemper Road in Cincinnati and named Sullivan as the operations manager of the new office. Sullivan agreed to pay

Rydell $8,000 per month to operate the office. The agreement purported to give Sullivan the right to any profits derived from AUM transactions, as well as the authority "to obligate [AUM] in any way he [deemed] it necessary."

{¶ 9} According to Rydell, Sullivan lacked the requisite experience to be eligible for a mortgage broker's license. Instead, Sullivan operated under AUM's second-mortgage license, which allowed him to take advantage of the then existing broker exemption. Sullivan needed AUM's second-mortgage license to broker loans.

{¶ 10} Shortly after Rydell and Sullivan had entered into the agreement, they learned that Ohio was going to revise its Mortgage Broker Act to remove the broker exemption for second-mortgage license holders. The change, effective in May 2002, required that mortgage brokers obtain a separate mortgage broker's license.[1] So Sullivan needed his own license to continue to broker mortgages.

{¶ 11} Sullivan still wanted to use the Airline Union's Mortgage name, so in January 2002, Rydell and Sullivan incorporated a new entity, AUMLTD. Rydell formally consented to AUMLTD's use of a business name similar to AUM's. In that way, Sullivan could use his newly acquired mortgage broker's license and continue to operate under the Airline Union's Mortgage name. Rydell testified that he had expected AUMLTD to funnel business to Ashore.

{¶ 12} Rydell acted as AUMLTD's statutory agent. Rydell named his son, Benjamin, as a partner and 95 percent owner of AUMLTD. Sullivan was listed as its president and as a 5 percent owner.

{¶ 13} Rydell's son never worked at the AUMLTD office. AUMLTD operated from AUM's Kemper Road office.

{¶ 14} Rydell met with Sullivan and Clements at the Kemper Road office several times during 2002 and 2003. After one such meeting in the summer of 2002, the AUM loan officers were instructed to steer their business to Ashore.

{¶ 15} AUMLTD began referring loans to Ashore in September 2002. From that time until August 2003, AUMLTD referred 122 loans to Ashore, most of which involved Clements as the seller of the property. The AUMLTD loans were worth $17,367,920, which represented about 20 percent of Ashore's business.

{¶ 16} In July 2003, Rydell learned that approximately ten AUMLTD loan applications to Ashore had been submitted with fraudulently inflated appraisals, but he took no steps to notify authorities.

{¶ 17} In the summer of 2003, the Kemper Road office was raided by the FBI. In an ensuing federal prosecution, Clements pleaded guilty to conspiracy to

---

1. See R.C. 1322.02, amended by S.B. No. 76, effective May 2, 2002.

commit fraud and to money laundering. Clements admitted that he and the AUM loan officers had created false documents to support loan applications.

### Troy's Deals

{¶ 18} Gary Swain worked as a loan officer for AUM from January 2000 until 2003. According to Swain, Sullivan and Clements had hired him and were his supervisors. Swain did not know that AUM and AUMLTD were separate entities.

{¶ 19} Sullivan and Clements instructed Swain and the other loan officers to use a procedure known as "Troy's Deals." In such a deal, Swain would advertise a house for rent. When a customer responded, Swain would obtain the customer's credit report. Then a realtor working with AUM would try to find a house for the customer.

{¶ 20} Once the customer had selected a house, Clements would purchase it. Sullivan or Clements would tell Swain a value that the home should be appraised for so that there would be an 80 percent loan-to-value ratio when AUM processed a refinanced loan on the property.

{¶ 21} Swain would have the home appraised and would suggest the inflated value to the appraiser, which the appraiser would adopt. The home would be appraised for the inflated value.

{¶ 22} The customer would execute a mortgage to Clements for an amount that was $5,000 more than Clements had just paid for the home. And then AUM would process a refinanced loan on the property through a lender. The refinanced-loan application would show the house to be owned by the customer.

{¶ 23} At some point, Swain testified, after a meeting between Sullivan, Clements, and Rydell, AUM's loan officers were instructed to begin sending all their loan applications to Ashore because they had been cut off by other lenders. Swain testified that AUM's contact at Ashore was Rydell.

{¶ 24} Swain met the Roarks through a rental advertisement. After the Roarks had decided to buy a home on Windswept Lane, Clements bought the home for $80,000.

{¶ 25} Swain had the Roarks execute a note and mortgage in favor of Clements for $85,000. Swain also prepared a loan application for $104,000 to refinance the property. He admitted that he gave Cynthia Roark some of his own money to deposit into her bank account. Swain instructed Roark to obtain a Verification of Deposit ("VOD") and then to withdraw the same sum immediately and give it to him. Swain said that he had learned this VOD technique from Sullivan and Clements.

{¶ 26} In June 2003, Swain referred Cynthia Roark's processed loan submission to Ashore for refinancing.

### Cynthia and Steven Roark

{¶ 27} Cynthia Roark testified that she and her husband, Steven, had been through a bankruptcy and had never owned a home. In the fall of 2002, Roark and her husband responded to a newspaper advertisement for a rental property. Roark spoke with Swain, who told her that the rental home was no longer available. Swain asked Roark whether she had ever considered purchasing a home.

{¶ 28} Swain obtained the Roarks' credit report and called them to say that he could help them buy a home with no down payment. Swain introduced the Roarks to Brian Withers, a real estate agent who worked with AUM.

{¶ 29} In April or May of 2003, Withers showed the Roarks the house on Windswept Lane. Withers said that the house had been appraised at $130,000, and that with the way that their loan worked, the Roarks could either get an appraisal or an inspection. Withers told them to get the appraisal.

{¶ 30} The Roarks continued to look for other houses. When they found other houses that they were interested in, they would call Withers. But, Roark testified, they were "constantly being put off that nothing ever fit our loan." After a few days, Withers called them and told them that someone else was interested in the Windswept property and that they would have to make a decision immediately.

{¶ 31} The Roarks chose to purchase the property. They made an offer on the property "in the 80s, 85, 89, something like that." They were told that their loan would be for about $104,000 to cover their outstanding debts, the brokerage fees, and the purchase price. Roark testified that they were comfortable obtaining the loan because, throughout the process, Swain and Withers had told them that the house was worth $130,000.

{¶ 32} In late May, Swain told the Roarks that they could pick up the keys and move into the house. The Roarks "signed a paper that we thought we were acknowledging that we were accepting keys to the home with the intent to purchase at a later date." Swain told them that he would contact them with a closing date.

{¶ 33} Unbeknownst to the Roarks, a deed, a settlement statement, and a mortgage, each dated May 22, 2003, indicated that Clements had sold the property to the Roarks for $85,000. The Roarks made no payments to Clements.

{¶ 34} An appraisal dated May 26, 2003, indicated that the property was valued at $130,000.

{¶ 35} In late June 2003, at what Roark testified was their "official closing," Swain and another man were present. The unidentified man repeatedly complained that he was short on time and that he was late for another meeting. The man flipped through documents and told the Roarks to sign them. The man told the Roarks that he would send them copies later because he did not have time for them to go through the documents.

{¶ 36} The Roarks did not realize that the paperwork that they had signed at that meeting indicated that they were the current owners of the Windswept Lane property. The Roarks executed a note and mortgage, dated June 26, 2003, in favor of Ashore Funding for $104,000. Ashore Funding immediately assigned the note and mortgage to Washington Mutual, which then sold it to the Federal National Mortgage Association ("FNMA").

{¶ 37} The Roarks made no payments on their loan. In February 2004, FNMA instituted a foreclosure action against them.

{¶ 38} In March 2004, FNMA sent a request to Washington Mutual that it repurchase the Roark loan. FNMA noted that the appraisal was unacceptable and that the property value was not supported. In turn, Washington Mutual requested that Ashore repurchase the Roark loan.

{¶ 39} Rydell contacted the Roarks to tell them that he needed them to write a statement describing how they had obtained their loan. Rydell said that he was working with the FBI and that the FBI needed this information.

{¶ 40} Rydell told the Roarks that he owned their loan and that he wanted to refinance it. Rydell told them that the foreclosure "had already been gone through, that there was no way [they] could keep the house, that at best [they] should sell it for 70,000 either to Seth [Rydell's investor] or they had a friend, Mark Valask, and they wanted [the Roarks] to go ahead and turn the house over for $70,000."

{¶ 41} Roark said that Rydell and Valask Realty called the Roarks repeatedly. Rydell sent them numerous letters. Employees of Ashore Funding began to leave notes on the Roarks' car. Ashore employees contacted friends of the Roarks, trying to get the friends to persuade the Roarks to call Ashore so that Ashore could help the Roarks.

{¶ 42} The Roarks became upset. Because Rydell had told them he was working with the FBI, Cynthia Roark called the FBI. An FBI agent told her not to have any contact with anyone at Ashore and that Rydell was not working with the agency.

### Danyel Jones

{¶ 43} Danyel Jones testified that a bankruptcy action against her had been dismissed in 2000 and that she had never owned a home. In the fall of 2002, Jones contacted Fritz Glaser, a loan officer at AUM.

{¶ 44} After checking Jones's credit report, Glaser told her that she could look for a house in the $95,000 price range. Jones found a house, which Glaser told her had been appraised for $129,000. Glaser told her that Airline Union had negotiated with the owners, "the Love family," for a purchase price of $92,000.

{¶ 45} In late February 2003, Glaser had Jones come to the office to fill out loan applications and "sign papers." He said that the Loves had moved out and that he would give her the house keys. Jones did not realize that she had purchased the house.

{¶ 46} A settlement statement, a deed, and a mortgage executed February 25, 2003, indicated that Jones had bought the property from Clements for $92,750.

{¶ 47} An appraisal report prepared for AUM, dated February 28, 2003, indicated that the property was worth $129,000.

{¶ 48} Jones went to what she believed was the closing in March and had been told that the Loves would be there. But when she arrived, Jones was told that the Loves had had a prior engagement and that they had already been there. Glaser and Clements were present at the meeting.

{¶ 49} Jones executed a note and mortgage dated March 17, 2003, in favor of Ashore for $103,200. Jones stopped making payments on the loan in October 2003. FNMA instituted a foreclosure action against Jones in March 2004.

{¶ 50} The court ultimately awarded Washington Mutual a judgment and decree in foreclosure on the Jones property. Upon confirmation, Washington Mutual asserted that the sale had not extinguished its claim and that a deficiency judgment remained against Jones. The court entered a deficiency judgment against Jones in the amount of $39,192.03. A month later, the court vacated the deficiency judgment.

### The Trial Court's Judgment

{¶ 51} Following a bench trial before a magistrate, the trial court entered judgment in favor of the homeowners on their claims against Rydell, Ashore, and AUM for violations of the Mortgage Broker Act and for civil conspiracy. The court dismissed Ashore's counterclaims against the homeowners.

### Ashore & Rydell's Assignments of Error

{¶ 52} In three assignments of error, Ashore and Rydell argue that the trial court erred (1) by failing to find the homeowners liable to Ashore for breach of

contract and for fraud, (2) by finding Ashore and Rydell liable for violations of the Ohio Mortgage Broker Act and for civil conspiracy, and (3) in its assessment of damages. We address the second assignment of error first.

### Civil Conspiracy

{¶ 53} In their second assignment of error, Ashore and Rydell argue that the trial court's judgment against them on the homeowners' claims for civil conspiracy and for violations of the Ohio Mortgage Broker Act was against the weight of the evidence.

{¶ 54} Our review of the trial court's factual determinations is highly deferential.[2] We will not reverse a judgment on the manifest weight of the evidence if there is some competent, credible evidence going to all the essential elements of the case.[3]

{¶ 55} Ohio defines civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."[4] A civil conspiracy claim cannot succeed without an underlying unlawful act.[5] In this case, the claimed unlawful act was the violation of the Mortgage Broker Act.

{¶ 56} The trial court determined that the defendants had violated several provisions of the Mortgage Broker Act, including R.C. 1322.07(B), (C), and (E). These sections provide the following: "No mortgage broker, registrant, licensee, or applicant for a certificate of registration or license under sections 1322.01 to 1322.12 of the Revised Code shall do any of the following: * * *

{¶ 57} "(B) Make false or misleading statements of a material fact, omissions of statements required by state law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations;

{¶ 58} "(C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings; * * *

---

2. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

3. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

4. *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, quoting *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640.

5. *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 700 N.E.2d 859.

{¶ 59} "(E) Knowingly make, propose, or solicit fraudulent, false, or misleading statements on any mortgage document or on any document related to a mortgage, including a mortgage application, real estate appraisal, or real estate settlement or closing document."

{¶ 60} The trial court determined that Sullivan, Clements, Swain, AUM, and AUMLTD had violated the Mortgage Broker Act and had participated in a conspiracy to defraud various lenders by knowingly submitting false documentation to the lenders in support of mortgage loan applications. The court found that the homeowners had suffered damages directly related to the defendants' conduct.

{¶ 61} Ashore and Rydell have not challenged the findings of unlawful conduct on appeal. Instead, they argue that the court erred by finding that they were participants in the conspiracy.

{¶ 62} In finding that Rydell and Ashore had participated in the conspiracy, the trial court determined that AUMLTD had been created by Rydell and Sullivan to be nothing more than a shell corporation. As a result, the court disregarded AUM's corporate form and held that its sole shareholder, Rydell, was personally liable. The court further determined that Ashore had overlooked obvious problems with the homeowners' loan applications.

{¶ 63} The court noted that the homeowners' loans listed Rydell's company, AUM, and not AUMLTD, as the mortgage broker. The appraisals for the homeowners' properties indicated that they had been conducted for AUM. The settlement statements for both properties reflected that broker fees and processing fees had been paid to AUM. And both statements indicated that yield-spread premiums had been paid directly by Ashore to AUM, outside of closing.

{¶ 64} The court noted that AUMLTD did not operate as a legal entity apart from AUM, and that the two operated from the same office. Moreover, Sullivan served as the operations manager and president of AUMLTD while working as an employee of AUM.

{¶ 65} Furthermore, the homeowners presented evidence that Rydell had used his control over AUM and its shell, AUMLTD, in such a manner as to defraud buyers and other lenders to their detriment. Rydell had set up AUMLTD to benefit personally both through his AUM agreement with Sullivan and through AUMLTD's active steering of business toward his other wholly owned entity, Ashore. Rydell protected his personal interests by naming his son as a dummy majority owner and partner of AUMLTD, by naming his AUM employee, Sullivan, as a minority owner and officer of AUMLTD, and by naming himself as AUMLTD's statutory agent.

{¶ 66} Rydell testified that he had listed his son as a majority owner "because [they] were going through a time where [Rydell] said to Jay that that $8,000, even though [Jay] may not be operating the company any more, [they] have a contract. And he said okay. It was all part of negotiations." Rydell's inability to explain the reason for the arrangement was further proof of his fraudulent intent.

{¶ 67} By Rydell's design, AUM and AUMLTD were essentially the same entity operating from the same office. Swain, an AUM employee, did not even know that the two existed separately. Even though AUM did not have a broker's license, it was listed as the broker on both the Roark and Jones loan applications. As a result, the homeowners and other lenders were led to believe that AUM held a broker's license.

{¶ 68} The homeowners introduced sufficient evidence to disregard AUM's corporate form to reach Rydell individually.[6]

{¶ 69} With respect to Ashore, its sole shareholder ensured that his other wholly owned entity, AUM, and its shell routed business to Ashore. This occurred despite obvious problems with most of the applications, including Clements's involvement as a prior purchaser, numerous bogus appraisals, and borrowers' low funds on deposit.

{¶ 70} For instance, Rydell testified that on a refinanced-loan application, a borrower would have to prove by way of a VOD that he had enough money in reserve to cover three months' worth of loan payments, but the homeowners' applications showed funds on deposit that fell far short of that amount.

{¶ 71} Moreover, the appraisals on the homeowners' properties were obviously inflated. The Roark application was supported by an appraisal indicating a value of $130,000, even though the property had just been sold four days earlier for $85,000. The Jones appraisal indicated a value of $129,000, despite the property's sale three days earlier for only $92,750.

{¶ 72} In both cases, the prior purchaser was Clements, who had met with Rydell and Sullivan to steer loan applications to Ashore. The relationship generated about 20 percent of Ashore's business.

{¶ 73} The homeowners presented sufficient evidence that Ashore was knowingly utilized in the scheme to defraud the homeowners and other lenders. Because the trial court's judgment against Rydell and Ashore was supported by competent, credible evidence, we overrule the second assignment of error.

---

6. See *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.* (1993), 67 Ohio St.3d 274, 289, 617 N.E.2d 1075.

### Admissibility of Deposition Testimony

{¶ 74} Ashore and Rydell argue that the trial court erred by relying upon Rydell's deposition testimony for substantive evidence to support its factual findings, when Rydell had actually testified at trial. They argue that, at most, the court should have considered the deposition testimony for purposes of impeachment evidence.

{¶ 75} The record shows that the homeowners moved the deposition into evidence at trial without any objection from Ashore or Rydell. Moreover, under Civ.R. 32(A), a party's deposition may be used by an adverse party for any purpose, including as substantive evidence.[7] So the trial court did not err by considering Rydell's deposition testimony.

### Trial Court's Consideration of Federal Proceedings

{¶ 76} Before the magistrate rendered his decision in this case, Ashore filed a request that he take judicial notice of certain documents from the federal criminal proceedings against Clements, including his indictment and his plea agreement. Then, in his decision, the magistrate adopted a statement of facts contained within Clements's written plea agreement. The magistrate found that the facts described in the statement coincided with the evidence presented at trial and accurately described the events that had transpired in the homeowners' purchases of their properties through Clements.

{¶ 77} Ashore and Rydell now argue that the trial court failed to also consider the "federal investigation and federal conclusions of law concerning Troy Clements, so as to weigh them with all of the other relevant evidence." Although Ashore had been listed in Clements's indictment as one of the many victims of his property-flipping scheme, the submitted documentation contained no "conclusions of law" by the federal court with respect to Ashore. Moreover, the trial court was concerned with whether Ashore's and Rydell's conduct constituted civil conspiracy under state law. Any failure on the part of the trial court to consider portions of the federal proceedings was inconsequential.

### Fraud and Breach–of–Contract Claims

{¶ 78} In their first assignment of error, Ashore and Rydell argue that the trial court erred by entering judgment in favor of the homeowners on Ashore's claims for breach of contract and for fraud. Ashore and Rydell contend that the court's judgment was against the weight of the evidence.

---

7. See *Strasburger v. Cent. Trust Co., N.A.* (Oct. 9, 1991), 1st Dist. No. C–900775, 1991 WL 207270.

{¶ 79} The elements of fraud are (1) a representation, (2) material to the transaction, (3) made falsely, with knowledge of its falsity, or with such reckless disregard for whether it is true or false that knowledge may be inferred, (4) with the intention of misleading another into relying upon it, (5) that causes the other party injury.[8]

{¶ 80} Ashore acknowledges that the homeowners were initially enticed into the property-flipping scheme by Clements and Sullivan at AUM. And Rydell testified that the homeowners "really had no clue as to what was going on, because not only were they unsophisticated buyers, but they were first-time home buyers."

{¶ 81} Given Rydell's admission that the homeowners lacked the requisite intent to defraud Ashore, as well as the homeowners' testimony to the same effect, we hold that the record fails to demonstrate that the homeowners had engaged in fraud. Because the trial court's determination was supported by the evidence, we will not overturn it.

{¶ 82} Ashore also argues that the trial court's judgment on its breach-of-contract claims was against the manifest weight of the evidence. Because Ashore did not plead claims for breach of contract against the homeowners and has made no showing that the issues had been tried by the implied consent of the parties, pursuant to Civ.R. 15(B), we will not consider the contract claims on appeal. Consequently, we overrule the first assignment of error.

### *Damages*

{¶ 83} In their third assignment of error, Rydell and Ashore argue that the trial court erred in its assessment of damages.

{¶ 84} A buyer injured by a violation under R.C. 1322.07 may bring an action for recovery of damages.[9] The damages awarded shall not be less than all compensation paid directly and indirectly to a mortgage broker from any source.[10] And the buyer may be awarded punitive damages.[11]

{¶ 85} In this case, the trial court awarded the Roarks $3,800 in compensatory damages and $25,000 in punitive damages. The court awarded Jones $25,000 in punitive damages and $42,192.03 in compensatory damages, $39,192.03

---

8. *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101, paragraph two of the syllabus.

9. R.C. 1322.11(A)(1).

10. R.C. 1322.11(A)(2).

11. R.C. 1322.11(A)(3).

of which represented the deficiency judgment that had been entered against Jones in the foreclosure action.

{¶ 86} The Roarks paid $3,800 in mortgage-broker fees, while Jones paid $3,000 in mortgage-broker fees. So to the extent that the compensatory-damage awards represented these losses, we sustain the trial court's award. But as Rydell and Ashore point out, the deficiency judgment against Jones was later vacated in an amended order. So we remand this case for the trial court to modify Jones's compensatory-damage award by subtracting $39,192.03 from the total set forth in the judgment entry.

{¶ 87} "[G]enerally, the amount of punitive damages to be awarded rests largely within the determination of the trier of fact." [12] In assessing punitive damages, the court should consider the degree of reprehensibility of the defendant's conduct, as well as the disparity between the harm suffered by the plaintiff and the amount of the punitive-damages award.[13]

{¶ 88} In this case, given the long-standing, premeditated nature of the misconduct, which included the defendants' bilking of innocent buyers, as well as the limited amount of the punitive-damages award, we will not disturb the trial court's judgment with respect to punitive damages.

### The Cross–Appeal

{¶ 89} In their cross-appeal, the homeowners argue in a single assignment of error that the trial court erred by failing to find AUMLTD liable for violations of the Ohio Mortgage Broker Act and for civil conspiracy. In essence, the homeowners argue that the trial court erred by denying their motions for default judgments.

{¶ 90} The homeowners perfected service of their third-party complaints upon AUMLTD. Prior to trial, the homeowners moved for default judgments against AUMLTD because it had failed to answer or to otherwise plead in either action.

{¶ 91} In his decision, the magistrate made no finding regarding AUMLTD's liability, and the homeowners lodged objections with the trial court. The trial court overruled all objections to the magistrate's decision, affirmed the decision, and denied all pending motions, including the homeowners' motions for default judgments.

---

12. *Villella v. Waikem Motors* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, overruled on other grounds in *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 635 N.E.2d 331.

13. See *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 439–440, 715 N.E.2d 546.

{¶ 92} A default judgment may be awarded when a party against whom a judgment for affirmative relief is sought has failed to plead or to otherwise defend in an action.[14] "This rule applies to original claims as well as to counterclaims * * * and is logically consistent with the general rule of pleading contained in Civ.R. 8(D), which reads in part that '[a]verments in a pleading to which a responsive pleading is required * * * are admitted when not denied in the responsive pleading.' "[15]

{¶ 93} In this case, where AUMLTD failed to answer the allegations in the homeowners' complaints, the trial court, under Civ.R. 8(D), should have construed those allegations as admitted.[16] Consequently, the trial court erred by denying the homeowners' motions for default judgments without considering whether the admitted allegations constituted violations of the Ohio Mortgage Broker Act and civil conspiracy.[17]

{¶ 94} Therefore, we sustain the homeowners' assignment of error. We reverse the trial court's denial of the default judgments and remand this cause for a determination whether the admitted allegations constituted violations of the Ohio Mortgage Broker Act or civil conspiracy, and if so, for a determination of damages.

## Conclusion

{¶ 95} Consequently, we reverse the trial court's judgment with respect to the amount of compensatory damages to Jones. We reverse the trial court's denial of default judgment to the homeowners on their claims against AUMLTD. We remand this cause to the trial court to correct its judgment in accordance with this decision. We affirm the trial court's judgment in all other respects.

Judgment affirmed in part
and reversed in part,
and cause remanded.

HILDEBRANDT, P.J., and DINKELACKER, J., concur.

_____

14. Civ.R. 55(A); see, also, *Davis v. Immediate Med. Servs.* (1997), 80 Ohio St.3d 10, 14, 684 N.E.2d 292.

15. *Ohio Valley Radiology Assoc., Inc. v. Ohio Valley Hosp. Assn.* (1986), 28 Ohio St.3d 118, 120, 28 OBR 216, 502 N.E.2d 599.

16. *Burdge v. On Guard Security Servs., Inc.,* 1st Dist. No. C–050522, 2006-Ohio-2092, 2006 WL 1115456.

17. See id.