Judgment reversed<br>and cause remanded.

PRESTON and WILLAMOWSKI, JJ., concur.

<hr>

SWAYNE, Appellee,

v.

BEEBLES INVESTMENTS, INC. et al., Appellants.

[Cite as *Swayne v. Beebles Invests., Inc.,* 176 Ohio App.3d 293, 2008-Ohio-1839.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 07AP–851.

Decided April 17, 2008.

Equal Justice Foundation and Judith B. Goldstein, for appellee.

Christopher J. Minnillo, for appellants.

TYACK, Judge.

{¶ 1} Defendants-appellants, Beebles Investments, Inc. and its president, Timothy R. Farkas, are appealing from a judgment entered against them in the court of common pleas awarding damages in the amount of $414,136.05.

{¶ 2} Certain facts are not in dispute. Plaintiff-appellee, Annie R. Swayne, is a senior citizen who lives by means of Social Security checks, disability checks, and a small pension. Her total monthly income is $1,206 per month. In 2002, she owned her home free and clear of any liens or mortgages. Swayne had inherited the home from her late husband when he died in 2000. The home was in need of repair, and she needed money to make the repairs. She approached Beebles in the hope of borrowing the needed funds. Beebles is a small corporation owned

by two brothers, Jeffrey and Timothy Farkas. Jeffrey Farkas takes no active role in the management of the corporation. Timothy Farkas controls all the management of the company, making all the day-to-day decisions.

{¶ 3} Swayne's credit score was too low to enable her to obtain a loan from an outside lender. Instead, Farkas offered to lend Swayne the funds directly. In completing the loan application and processing, two separate sets of loan documents were executed, one on June 27, 2002, and one the following day. The first set of documents stated that Swayne was required to make monthly payments of $250, followed by a large balloon payment on the loan's maturity date. The Home Ownership and Equity Protection Act of 1994 ("HOEPA") document of the same date state that the loan's annual percentage rate is 37.918 percent. According to the terms of the second set of documents, Swayne was not required to make any payments for one year, and at the end of that year, the entire amount was due, plus interest, for a total of $25,612.11. The HOEPA document indicates that the interest rate is 36.508 percent. The Federal Truth–in–Lending Disclosure Statement, included with the loan documents, states that the annual percentage rate is 41.657 percent.

{¶ 4} A rider was attached to the balloon note that guaranteed Swayne the right "to obtain a new loan with a new Maturity Date of AUGUST 1, 2032," provided she met certain conditions: (1) Swayne had to be the owner-occupier of the property at the time she exercised her right to refinance; (2) she had to be current on the monthly payments due on the note, and not more than 30 days late on any of the 12 monthly payments immediately preceding the loan's maturity date; (3) she could not allow the property to become encumbered, or otherwise allow some adverse action to have been taken against the property or its title; and (4) she had to agree that the new loan rate would not exceed the note rate by more than five percentage points. Beebles was to notify Swayne of her option to refinance at least 60 days prior to the note's maturity date, and Swayne was to notify Beebles of her intent to exercise the refinance option between 60 and 45 days before the note's maturity date.

{¶ 5} Beebles received $2,125 of the $20,000 proceeds broken down as follows: Beebles collected an origination fee of $1,000; a loan discount fee of $1,000; a credit report fee of $50; and a processing fee of $75. Combining these fees with title insurance costs, the costs of an appraisal, a fee for credit counseling, and miscellaneous other fees left only $13,734 of the $20,000 for Swayne.

{¶ 6} Swayne deposited the funds into a joint checking account she owned with her daughter. The daughter's creditors garnished a portion of the funds, and Swayne spent the remainder catching up on past-due bills and paying emergency medical bills. Swayne did not have the repairs made to her house.

{¶ 7} The mortgage called for no payments during the first year of its existence and a balloon payment of $25,612.11 at the end of one year. As the maturity date approached, it was clear that Swayne would be unable to pay the balloon payment. In March 2007, several lenders turned Swayne down due to her low credit score. Despite Swayne's having met all the conditions of the refinance option in the contract, Farkas told Swayne that she was not qualified for refinancing, and unless she deeded her house to him, he would foreclose on her home. Beebles offered to take title to Swayne's house, do the necessary repairs, and lease the house to Swayne for two years at $450 per month plus utilities. At the end of the two-year period, Swayne had the option to buy back her home from Beebles, and if she was unable to obtain financing, Beebles agreed to renegotiate and extend the lease term. Swayne agreed.

{¶ 8} Beebles took title, had repairs done, and approximately five months later sold the house for $55,000 to PBL Family Limited, a trust managed by friends of Timothy Farkas. PBL subsequently raised Swayne's rent to $500 per month.

{¶ 9} Swayne eventually found her way to the Equal Justice Foundation, which filed suit on her behalf. The trial court granted summary judgment in favor of Swayne on liability issues. The trial court found both the balloon loan agreement and the subsequent lease agreement to be unconscionable. The trial court also found in favor of Swayne on the issue of fraud and that Timothy Farkas was individually liable for the wrongdoing of Beebles. After a hearing on damages before a magistrate, final judgment was rendered for $414,136.05. The trial court granted the judgment not only against Beebles, but also against Timothy Farkas individually. Beebles and Farkas are not appealing the damages award, but are appealing the trial court's grant of summary judgment. They have presented five assignments of error for our consideration:

FIRST ASSIGNMENT OF ERROR:

The trial court erred in granting summary judgment to the appellee with respect to the claim that the July 10, 2002 balloon note, mortgage agreement and transaction were unconscionable. The terms and conditions of the loan and mortgage agreement were not unconscionable, and furthermore were the subject of a contract of novation.

SECOND ASSIGNMENT OF ERROR:

The Trial Court erred in granting Appellee summary judgment on her claim of unconscionability with respect to the June 5, 2003 rental agreement.

THIRD ASSIGNMENT OF ERROR:

The trial court erred in granting Appellee summary judgment on her claim of a violation of the Ohio mortgage brokers act. Appellant Farkas was not acting as a mortgage broker with respect to the July 10, 2002 mortgage loan.

Neither of the Appellants acted as mortgage brokers with respect to the June 5, 2003 real estate agreement, which did not involve a mortgage loan.

FOURTH ASSIGNMENT OF ERROR:

The trial court erred in granting summary judgment to Appellee on her fraud claim.

FIFTH ASSIGNMENT OF ERROR:

The trial court erred in overruling the motion of Timothy R. Farkas for summary judgment with respect to individual liability and finding that Appellee had established the elements to the pierce of the corporate veil of Appellant Beebles Investments, Inc.

{¶ 10} Our standard of review on a motion for summary judgment is de novo. *Coventry Twp. v. Ecker* (1995), 101 Ohio App.3d 38, 654 N.E.2d 1327. However, Swayne contends that because Beebles did not file objections to the magistrate's decision on damages, the appellants have waived all but plain error. We disagree.

{¶ 11} The trial court based its decision on the summary judgment materials it had before it, not the evidence elicited at the damages hearing. The damages hearing was just that: the magistrate was determining damages after a finding of liability issued by the trial court. The parties were not litigating the issue of liability before the magistrate. Therefore, we evaluate the grant of summary judgment under the usual de novo standard, conducting an independent review of the record and standing in the shoes of the trial court. *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383.

{¶ 12} Summary judgment is appropriate only when the party moving for summary judgment demonstrates that (1) no genuine issue of material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made when the evidence is construed in a light most favorable to the nonmoving party. Civ.R 56(C); *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. With this standard in mind, we turn to the assignments of error.

{¶ 13} In their first assignment of error, Beebles and Farkas assert that the trial court erred in finding that the terms of the balloon note mortgage agreement were unconscionable. Appellants contend that the terms and conditions were "unusually favorable to the borrower." The facts show otherwise.

{¶ 14} Unconscionability is a legal question involving an absence of choice on the part of one of the parties to a contract and contract terms that are unreasonably favorable to the other party. *Jeffrey Mining Prod., L.P. v. Left*

*Fork Mining Co.* (2001), 143 Ohio App.3d 708, 718, 758 N.E.2d 1173; *Orlett v. Suburban Propane* (1989), 54 Ohio App.3d 127, 129, 561 N.E.2d 1066, relying on *Williams v. Walker–Thomas Furniture Co.* (C.A.D.C.1965), 350 F.2d 445, 449. In *Williams,* Judge Skelly Wright stated, "Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction. In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power." Ohio courts analyze unconscionability under a two-pronged test: (1) substantive unconscionability, which means whether the contract terms are unfair and unreasonable, and (2) procedural unconscionability, which examines the relative bargaining power of the parties. See *Small v. HCF of Perrysburg, Inc.,* 159 Ohio App.3d 66, 71, 2004-Ohio-5757, 823 N.E.2d 19, at ¶ 21–22.

{¶ 15} Here, Swayne was in her 70s when she engaged in this transaction. She had not worked outside the home since 1972. Her husband, who had managed the couple's finances, had died two years before. Swayne soon found herself in need of money to pay bills and to repair the roof, kitchen, and bathroom of her home of 20 years. For help, she contacted a company that listed itself as A–Loan. Beebles does business under the name of A–Loan.

{¶ 16} Swayne did not seek the help of a lawyer or even of a financially sophisticated friend. She stated that she relied upon the representations of a loan officer for Beebles and upon the representations of Timothy Farkas personally in deciding to go forward with the mortgage. On July 10, 2002, she executed a note and a mortgage. The mortgage is 12 pages of single-spaced type. In addition, there is a two-page Balloon Rider (Conditional Right to Refinance). The interest on the balloon note is listed at 24.990 percent, but the federal Truth–in–Lending Disclosure lists the annual percentage rate as 41.657 percent, with a final balloon payment of $25,612.11 due on August 1, 2003. The interest rate alone clearly favors the lender.

{¶ 17} Of the $20,000 face amount of the note, Swayne received $13,734.60. This demonstrates that approximately 31 percent of the loan's proceeds were allocated to closing costs and fees. As indicated earlier, Beebles received a $1,000 loan origination fee, a $1,000 loan discount fee, a $75 processing fee, and a $50 payment purportedly to reimburse the costs for a credit report. In addition to state and federal statutes that prohibit some of these provisions, these numbers, on their face, are one-sided in favor of Beebles.

{¶ 18} Beebles knew that with a monthly income of $1,206, Swayne would be unable to make the balloon payment when it became due. Thus, Beebles placed Swayne in a position in which Beebles knew or should have known that Swayne was certain to default. All of these factors demonstrate substantive unconscionability.

{¶ 19} With respect to procedural unconscionability, the relative bargaining positions of the parties could not be more disparate. Beebles and Farkas were in the business of brokering mortgages. Beebles took advantage of Swayne's lack of financial sophistication by having Swayne execute two sets of loan documents with differing terms. Swayne was unfamiliar with financial matters, as she was a recent widow whose husband had managed the couple's finances. Swayne did not consult a lawyer or even a financially sophisticated friend. Rather, she relied upon the representations of the loan officer, and then Farkas himself.

{¶ 20} Farkas, on the other hand, knew the poor state of Swayne's finances, knew of her bad credit, knew of her lack of resources, knew that no lenders were willing to lend her money, and knew that Swayne could not possibly pay back the balloon note. He also testified that even with the loan, there was "no way" that Swayne had enough money to do the necessary repairs to her house. Despite all of that knowledge, appellants entered into a loan agreement with terms that Swayne could not possibly meet. On these undisputed facts, Farkas and Beebles took advantage of the parties' unequal bargaining positions to create a one-sided agreement in their favor.

{¶ 21} Appellants argue that the loan agreement's basic terms were ameliorated by a provision that allowed for conversion of the loan to a fixed-rate 30–year mortgage. The Balloon Rider (Conditional Right to Refinance) allows an initial rate of as much as five percent above the balloon-note interest rate. In terms of Swayne's situation, the refinancing could have been at an interest rate of almost 30 percent, assuming the original loan was at an interest rate of 24.990 percent, or as high as 46 percent based on the truth-in-lending statement. Further, Farkas made it clear when deposed in conjunction with this loan that he never had any intention of allowing this refinancing to occur. He testified that he did not normally do long-term loans, as he did not want to tie up his money up. He wanted his money back. The money was needed for additional advertising, the cost of loan officers to recruit business, and other costs to originate more loans that could then be bundled and sold. Thus, the promise to refinance the balloon note was illusory.

{¶ 22} Appellants also argue that a novation occurred. We do not see this to be the case. A novation "is created where a previous *valid* obligation is extinguished by a new *valid* contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration." (Emphasis added.) *McGlothin v. Huffman* (1994), 94 Ohio App.3d 240, 244, 640 N.E.2d 598. As the time approached for the balloon payment to be made, Swayne clearly had no ability to pay $25,612.11. She did not have the ability to acquire such a sum of money with her only source of

income being a pension of $200 per month, Social Security of $502 per month, and a disability check of $504 per month. Her only collateral was a house still in disrepair. Beebles did not wish to enter into a long-term mortgage, leaving Swayne with the option of being evicted for failure to pay the mortgage balloon payment following a foreclosure or agreeing to transfer the house to Beebles and being allowed to have a two-year lease for what had been her residence for over 20 years. Her acquiescence to the offer was not a valid novation because the previous obligation was unconscionable. We shall address the validity of the second agreement in relationship to the next assignment of error.

{¶ 23} Given these undisputed facts, the trial court's finding that the terms of the July 10, 2002 note and mortgage were unconscionable was an appropriate, indeed the only appropriate, finding. The first assignment of error is overruled.

{¶ 24} In the second assignment of error, appellants challenge the trial court's ruling that the June 5, 2003 lease agreement was unconscionable. The same analysis as discussed with respect to the first assignment of error applies to the real estate lease and buyback agreement, with the added factor that Swayne's financial condition was even more precarious.

{¶ 25} In exchange for the deed to the home, Beebles agreed to release Swayne from her obligation on the note. Beebles further agreed to make repairs to the home and to lease it to Swayne for $450 per month. At the end of two years, Beebles was supposed to sell the house back to Swayne for a price to be determined. If, at that time, Swayne was unable to get financing, Beebles was to renegotiate/extend the lease term.

{¶ 26} Approximately five months into the agreement, Beebles sold the house to PBL for $55,000. Farkas testified that he sold the house because he didn't want to deal with it, stating, "I wanted my money." Swayne began paying her rent to PBL and, at the end of the lease term, PBL offered to sell the house to Swayne for $70,000.

{¶ 27} Under the terms of this agreement, Beebles acquired Swayne's house for the amount they lent to her for home improvements ($20,000 less at least $2,000 in fees that went straight to Beebles) and the actual repair work performed. Farkas testified that he hired "drunks" to perform the work on the house and that they had created more work. Farkas stated that he had then hired another drunken contractor to finish the work. Farkas estimated that he had spent $25,000 to $30,000 to repair the house. An appraisal of the property in June 2002 *before* repairs, estimated the value of the home at $55,000.

{¶ 28} As for Swayne, the effect of the two agreements was that she realized $13,745.60 on the sale of her home. That home was appraised at $55,000 before the repairs were made. Beebles repaired the house after Swayne was no longer

the owner of the premises, but a tenant. Farkas stated that when he gave Swayne the initial loan, "[t]he house was not livable." As Swayne's landlord, Farkas had a duty to maintain the property "in a fit and habitable condition." R.C. 5321.04(A)(2). When Farkas then sold the house out from under Swayne, she lost her opportunity to reacquire her home if her financial condition improved.

{¶ 29} Beebles and Farkas have made much of a purported issue of fact regarding the refinancing agreement. Beebles contends that Swayne was not interested in converting the original debt into a 30–year mortgage. However, Beebles ignores its preemptive refusal to refinance because Swayne was "not qualified."[1] Beebles also ignores Swayne's uncontroverted affidavit that Farkas threatened to foreclose on the property unless Swayne deeded the house to him. Beebles also states that Swayne requested additional money from Beebles to complete the home repairs. However, the citation to the record offered by appellants does not support the allegation. The affidavit of Timothy Farkas states that Beebles was not in the business of making long-term mortgage loans. "*It was decided* that Beebles would make sure that Mrs. Swayne received house repairs." (Emphasis added.) Appellants also claim that paragraph three of the affidavit of Farkas states that Swayne did not ask to refinance the original debt but, instead, requested more money to complete house repairs. Nowhere in paragraph three of the affidavit does this statement exist. Appellants have fallen short of creating a genuine issue of material fact on the issue of whether Swayne invoked her option to refinance or requested additional funds. What is clear is that Farkas, as he put it, wanted his money back. The June 5, 2003 real estate purchase agreement and release was designed to insure that Farkas and Beebles would recover the initial investment along with a handsome profit.

{¶ 30} All these circumstances, coupled with the fact that the June 5, 2003 real estate lease agreement was procured in association with the unconscionable balloon loan, lead us to conclude that the June 5, 2003 agreement was unconscionable as well.

{¶ 31} The second assignment of error is overruled.

■ {¶ 32} In their third assignment of error, appellants contend that the trial court erred in finding a violation of the Ohio Mortgage Brokers Act, R.C. 1322.01 et seq. The act is designed in part to protect mortgage borrowers from wrongful

---

1. Arguably, Swayne was not qualified to enter into the original loan agreement either, but that did not stop Beebles from lending her net cash of approximately $13,000 with a balloon payment one year later of over $25,000. The argument that Swayne was unqualified for a refinance is disingenuous in light of her obvious failure to qualify for the original loan from any outside lender.

conduct by mortgage brokers. *Myer v. Preferred Credit, Inc.* (2001), 117 Ohio Misc.2d 8, 32, 766 N.E.2d 612.

{¶ 33} The act states:

No mortgage broker * * * shall do any of the following:

* * *

(B) Make false or misleading statements of a material fact, omissions of statements required by state law, or false promises regarding a material fact, through advertising or other means, or engage in a continued course of misrepresentations;

(C) Engage in conduct that constitutes improper, fraudulent, or dishonest dealings;

* * *

(E) Knowingly make, propose, or solicit fraudulent, false, or misleading statements on any mortgage document or on any document related to a mortgage, including a mortgage application, real estate appraisal, or real estate settlement or closing document. * * *

(F) Knowingly instruct, solicit, propose, or otherwise cause a buyer to sign in blank a mortgage related document[.]

{¶ 34} Timothy Farkas asserts that, as an individual, he has never been a mortgage broker, registrant, licensee or applicant. Therefore, he claims that summary judgment against him personally was incorrect as a matter of law.

{¶ 35} It is undisputed that Beebles Investment, d.b.a. A–Loan Company, is licensed as a mortgage broker in the state of Ohio. The evidence is also undisputed that Timothy Farkas exercised total and complete control over the corporation. In *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075, paragraph three of the syllabus, the Supreme Court of Ohio stated:

The corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong.

{¶ 36} Here, appellants clearly met all the criteria for disregarding the corporate form. Although Timothy Farkas may not have held the license personally, he used the corporate form and the privileges of the mortgage broker's license in the name of Beebles to engage in the transactions at issue.

Therefore, in this case, there was no error in rendering summary judgment against Timothy Farkas personally.

{¶ 37} Appellants further argue that this act does not apply to them because they were acting in the role of lender, and not acting as a mortgage broker with respect to the 2002 loan and the 2003 lease and buyback agreement.

{¶ 38} Appellants were acting as a mortgage broker when Swayne first contacted Beebles, d.b.a. A–Loan Company, for a home-improvement loan. They obtained information from Swayne and attempted to broker a mortgage with an outside lender, but were unsuccessful because of Swayne's poor credit. In *Stone v. Davis* (1981), 66 Ohio St.2d 74, 20 O.O.3d 64, 419 N.E.2d 1094, a case involving mortgage insurance, the Supreme Court of Ohio suggested that everything encompassed by loan processing entails a fiduciary duty. See Legal Aid Society of Cleveland and Ohio State Law Services Association, Consumer Law (2007 Ed.) Section 14.73, at 608.

{¶ 39} Here, appellants were in a fiduciary relationship with Swayne while they were processing Swayne's loan. A mortgage broker has a fiduciary duty to his or her client. " 'The liabilities of a broker to his [principal] are those of an agent. The relation of principal and agent is always regarded by the court as a fiduciary one, implying trust and confidence.' " *Myer*, 117 Ohio Misc.2d at 23, 766 N.E.2d 612, quoting 10 Ohio Jurisprudence 3d (1995) 96, Brokers, Section 116; *Carver v. Discount Funding Assocs., Inc.* (June 10, 2004), No. CVH 20040126, 2004 WL 2827229. When appellants "switched hats" and became the lender, they engaged in deceptive and unfair practices in such a manner that Swayne would never be able to pay off her loan and would lose her house to appellants.

{¶ 40} Abuse of a relation of trust or confidence for personal aggrandizement is the cardinal sin of a fiduciary. *Myer*, 117 Ohio Misc.2d at 24, 766 N.E.2d 612. Appellants' fiduciary duty to Swayne did not cease to exist once they brokered the deal to themselves. Appellants' fiduciary relationship with Swayne encompassed appellants' self-dealing when taking over the loan themselves. Appellants used the information they had gleaned from Swayne and the trust that they had established with her to broker an unconscionable deal that was to their advantage, not Swayne's.

{¶ 41} There was uncontroverted evidence that appellants violated the Mortgage Brokers Act in at least four ways: (1) they placed Swayne in a one-year balloon note despite the act's prohibitions against balloon loans with terms of fewer than five years, (2) they induced Swayne to sign a blank loan document that was completed by someone other than a loan officer or a mortgage broker, (3) they provided three different good-faith estimates within two days and had

Swayne execute two different sets of loan documents, and (4) they charged Swayne $1,000 in points to reduce her loan rate but failed to actually reduce the rate.

{¶ 42} Swayne established that she was entitled to summary judgment for violations of the Mortgage Brokers Act and, therefore, the third assignment of error is not well taken and is overruled.

{¶ 43} In their fourth assignment of error, Beebles and Timothy Farkas assert that the trial court erred in granting summary judgment in favor of Swayne on her claim of fraud. Appellants characterize the trial court as finding fraud because appellants extended credit to a borrower in poor financial condition. This is not what the trial court held and not what Swayne demonstrated in her motion for summary judgment.

{¶ 44} The elements of fraud are (1) a representation (2) material to the transaction (3) made falsely, with knowledge of its falsity, or with such reckless disregard for whether it is true or false that knowledge may be inferred (4) with the intention of misleading another into relying upon it (5) that causes the other party injury. *Roark v. Rydell,* 174 Ohio App.3d 186, 2007-Ohio-6873, 881 N.E.2d 333, at ¶ 79.

{¶ 45} In this case, the record is clear that Swayne was never in a financially sound position to afford a mortgage loan of $20,000. Nevertheless, appellants represented to her that she could afford such a loan and would be able to qualify for refinancing even after using the loan proceeds. Appellants also knew that Swayne would realize only $13,734.60 from the loan, that she did not have enough money to repair her home, that she could not pay the loan off in one year, and that she could not qualify for refinancing from another lender.

{¶ 46} Less than a year later, Farkas also informed Swayne that if she did not sign the new agreement and deed her home over to him, she would face foreclosure, even though the loan agreement provided that Swayne had a conditional right to refinance. At the time Farkas threatened Swayne with foreclosure, she was in compliance with all the conditions necessary for her to refinance.

{¶ 47} Farkas also falsely represented to Swayne that she could lease the property from A–Loan for two years, after which she could repurchase the property or renegotiate an extended lease. Selling the home to an outside party approximately five months into the lease is evidence that the promise was made with a present intention not to perform.

{¶ 48} Swayne sufficiently established the existence of fraud with respect to appellants, and therefore it was not error for the trial court to grant summary

judgment on this claim. The fourth assignment of error is not well taken and is overruled.

{¶ 49} In their fifth assignment of error, appellants contend that the trial court erred in holding Timothy Farkas individually liable to Swayne for his unconscionable and fraudulent acts and for his violations of the Ohio Mortgage Broker's Act.

{¶ 50} As discussed above, Swayne provided evidence in support of disregarding the corporate form to reach Farkas individually. See *Roark*, 174 Ohio App.3d 186, 2007-Ohio-6873, 881 N.E.2d 333, at ¶ 68. The only additional argument Farkas raises with respect to this assignment of error is that his brother was an additional shareholder, and therefore, it was error to pierce the corporate veil.

{¶ 51} Here, Farkas's control over the company was so complete as to warrant the trial court's decision to hold him personally liable. As the Supreme Court of Ohio held in *Belvedere Condominium Unit Owners' Assn.*, "the 'veil' of the corporation can be 'pierced' and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." 67 Ohio St.3d at 287, 617 N.E.2d 1075. Timothy Farkas's brother was a mere passive investor, who contributed nothing to the running of the business. Consequently, it was Timothy Farkas who put Swayne into an unconscionable loan, who fraudulently misled her into transferring the deed to him, and who sold the home to another party after promising to lease the property to Swayne. For all of these reasons, the decision of the trial court to hold Timothy Farkas personally liable was appropriate. The fifth assignment of error is not well taken and is overruled.

{¶ 52} Based on the foregoing, appellants' five assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

Judgment affirmed.

McGRATH, P.J., and BRYANT, J., concur.