**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0391n.06

**No. 19-3690**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 08, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| G. RALPH ELLIOTT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| FIRST FEDERAL COMMUNITY BANK OF BUCYRUS, | ) | DISTRICT OF OHIO |
| | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

BEFORE: GIBBONS, McKEAGUE, and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant G. Ralph Elliott brought this action under the Truth in Lending Act (TILA) asserting that Defendant-Appellee First Federal Community Bank of Bucyrus (the Bank) failed to properly verify his income and negligently approved his mortgage loan. The Bank counterclaimed for breach of contract and sought to foreclose on the property. The district court granted summary judgment in the Bank's favor. Because the Bank's failure to verify and document Elliott's listed income violated the TILA, we REVERSE the grant of summary judgment to the Bank on that claim, REVERSE the denial of summary judgment to Elliott, and REMAND for further proceedings. We AFFIRM the district court's grant of summary judgment on the negligence claim and the magistrate judge's decision allowing the Bank to amend its answer.

**I.**

Elliott, born in 1936, worked as a licensed real estate agent for over 30 years. His fourth wife, Golan, was also a realtor, and the two worked together until sometime in 2014. Elliott and Golan owned at least two homes in Ohio: one on Maple Ridge Road, and one on Restoration Drive. In July 2013, Elliott and Golan refinanced their mortgage on the Maple Ridge Road property, receiving from Defendant a $320,000 loan at 4.25% interest, providing for monthly payments of $1981.55 over 20 years (2013 Loan).

At the end of 2014, Golan and Elliott contemplated separating and agreed, among other things, to divide the properties: Golan would relinquish all interest in, and Elliott would assume all responsibility for, the Maple Ridge Road home, where Elliott was living, and Elliott would relinquish all interest in, and Golan would assume all responsibility for, the Restoration Drive home. To accomplish this, Elliott submitted an application for a loan in his name alone to be secured by the Maple Ridge Road property. The application listed the amount of the loan as $315,000 to be paid back over 25 years with an interest rate of 4.875%, resulting in monthly payments of $1818.59.[1] The application listed his income as follows: base employment income of $528.95 per month, spousal support of $2300 per month, Social Security of $1975 per month, and rental income of $1400 per month.

Eric Savidge was the loan officer who reviewed Elliott's application and gathered relevant documentation. To verify the spousal-support income, the Bank relied on representations from Golan and Elliott that they were going to enter a separation agreement requiring payment of spousal support to Elliott. The separation agreement itself, however, which provided for $2200

---

[1] With property taxes and insurance, the monthly payment was $2318.46.

per month in spousal support to Elliott, was not executed until early February 2015, nearly two months after the loan was consummated.

To verify rental income, the Bank reviewed Elliott's tax returns showing rental income in the past, but not from the Maple Ridge Road property. Although unknown to the Bank, in March 2014, Elliott entered into a one-year lease with a tenant, leasing a portion of the Maple Ridge Road property for $1000 per month. And in March 2015, after his loan closed, Elliott entered a new one-year lease with a different tenant for $1000 per month.

On November 25, 2014, the Bank's loan committee rejected the loan. After the initial rejection, Golan met with the Bank's President, Phil Gerber, and Vice President, Brad Murtiff, explained that it was important to her that Elliott be able to stay at the Maple Ridge Road property, and assured the Bank that she would enter into a separation agreement that would cover Elliott's monthly mortgage payments. She also explained that the agreement would require her to maintain a $250,000 life insurance policy with Elliott as the beneficiary.

After the meeting, Gerber emailed the other members of the loan committee, explaining his meeting with Golan and Murtiff, and stating that he and Murtiff now believed they should approve the loan. The information Elliott listed on the loan application resulted in a debt-to-income ratio of 37.367%, lower than the Bank's 40% maximum threshold at the time. Elliott's credit scores were 652 and 663, which were near the Bank's guideline of 660. All members of the loan committee agreed to approve the loan on December 3, 2014.

On December 11, 2014, Elliott executed a promissory note for $315,000 and a mortgage securing the loan (2014 Loan). On February 4, 2015, Elliott signed the separation agreement, which provided that Elliott would be paid spousal support of $2200 per month provided certain conditions did not occur.

Golan paid spousal support for a few months but then stopped. Elliott testified in this case that he does not recall why he and Golan did not follow through with the separation agreement. But he acknowledged that he testified in his divorce case that he decided not to abide by the separation agreement and instead sought more spousal support from the divorce court. In discovery responses, Golan stated that she paid $2200 in spousal support for three months until Elliott refused to perform the separation agreement.

Elliott was also fired from his job, and bills from his divorce proceedings began to pile up. The divorce judgment was far less favorable to Elliott than the separation agreement. The divorce court ordered Elliott to pay a substantial sum to Golan for real-estate division and marital debt, which he would not have owed had he abided by the separation agreement. Additionally, the divorce court ordered Golan to pay Elliott only $250 per month in spousal support for three years. Elliott eventually defaulted on the Maple Ridge Road note and mortgage in early 2017, and the Bank sent him a notice of default.

Elliott filed this action on January 13, 2017, alleging two claims against the Bank: (1) violation of the TILA by making the 2014 loan to Elliott without a reasonable and good-faith determination that he had a reasonable ability to repay the loan and for failing to verify his stated income with documentation; and (2) negligence in making the 2014 loan.

Before the Bank filed its answer in this case, it filed a foreclosure action in Ohio state court. On August 7, 2017, the state trial court granted Elliott's motion to dismiss the foreclosure action, finding that the Bank's claims "arise out of the same transaction or occurrence that is the subject matter" of this case, "specifically, the subject note and mortgage," and thus allowing a separate foreclosure action "would result in the multiplicity of suits, would be contrary to the spirit and intent of Ohio Rule of Civil Procedure 13(a), entitled, 'Compulsory Counterclaims,' and would

not be in the interest of judicial economy." R. 19-1, PID 79. The state court, therefore, dismissed the bank's claims without prejudice.

On August 29, 2017—after the deadline to file amended pleadings, which was set for June 30, 2017—the Bank filed a motion for leave to file an amended answer to include counterclaims for breach of contract and foreclosure. Several months later, the Ohio Court of Appeals affirmed the state trial court's dismissal.

The magistrate judge granted the Bank's motion for leave to amend its answer after finding that the Bank had been diligent in seeking to amend by filing its motion shortly after the state trial court's dismissal of the foreclosure action. The magistrate judge also rejected Elliott's primary argument that the Bank could not amend its answer because the foreclosure action involved compulsory counterclaims that the Bank was required to bring at the outset of this case. The magistrate judge extended deadlines for completing discovery and filing dispositive motions.

Both parties filed motions for summary judgment. The district court denied Elliott's motion but granted the Bank's. As to the TILA claim, the district court found that the Bank had been diligent in determining whether Elliott had the ability to repay the loan and that it was not foreseeable to the Bank that Elliott and Golan would not abide by the terms of the separation agreement. It also reasoned that the Bank's reliance on the separation agreement and representations from Golan to verify spousal-support income, and tax returns and a then-current lease to verify rental income, constituted compliance with applicable regulations.[2] The district court determined that Elliott's negligence claim failed because the Bank owed no duty to Elliott.

---

[2] In doing so, the district court appeared to overlook that the separation agreement was not executed until after the loan was consummated and the Bank had no record of the then-current lease for the Maple Ridge Road property.

Finally, the district court granted summary judgment to the Bank on its breach-of-contract claim and issued a decree of foreclosure against the Maple Ridge Road property.

Elliott then filed a motion under Federal Rules of Civil Procedure 52, 59, 60, and 62(a), requesting amended or additional findings, an altered or amended judgment, relief from judgment, and a stay of foreclosure. The district court granted a stay of foreclosure but otherwise denied the motion.

Elliott now appeals.

## II.

Elliott first argues that the magistrate judge abused her discretion in granting the Bank's motion for leave to amend its answer to assert counterclaims against Elliott after the initial deadline to file amended pleadings under the scheduling order. We review that determination for abuse of discretion. *See Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 346 (6th Cir. 2007).

> Generally, a party may amend its pleading once as a matter of course, but in all other cases it may amend a pleading only with the opposing party's consent or with leave of the court. Fed. R. Civ. P. 15(a). "The court should freely give leave when justice so requires." *Id.* Once the scheduling order's deadline to amend the complaint passes, however, "a plaintiff first must show good cause under Rule 16(b) [of the Federal Rules of Civil Procedure] for failure earlier to seek leave to amend" and the district court must evaluate prejudice to the nonmoving party "before a court will [even] consider whether amendment is proper under Rule 15(a)." *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003).

*Commerce Benefits Grp., Inc. v. McKesson Corp.*, 326 F. App'x 369, 376 (6th Cir. 2009) (alterations in original) (footnote omitted).

As an initial matter, the Bank argues that Elliott is precluded from challenging the magistrate judge's grant of its motion for leave to amend because Elliott never objected to the magistrate judge's order. The Bank asserts that the magistrate judge's ruling was made pursuant

to Federal Rule of Civil Procedure 72(a), which governs referrals of non-dispositive motions to a magistrate judge and provides in relevant part that

> [a] party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely objected to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law.

In *Scott v. Eastman Chemical Co.*, 275 F. App'x 466, 483-84 (6th Cir. 2008), the magistrate judge denied the plaintiff's motion to amend her complaint, and the plaintiff failed to object. Applying Rule 72(a)'s plain language, we held that because the plaintiff "did not object, she has waived her right to assign error to the Magistrate Judge's order" on appeal. *Id.* at 484; *see also In re Garcia*, 347 F. App'x 381, 382 (10th Cir. 2009) ("While 28 U.S.C. § 636(b)(1) provides that a party may file objections to a report and recommendation, it has long been accepted in this circuit that a party may file objections within ten days or he may not, as he chooses, but he shall do so if he wishes further consideration." (internal quotation marks and citations omitted)); *cf. Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("Accordingly, we hold that a *pro se* litigant who fails to object timely to a magistrate's order on a non-dispositive matter waives the right to appellate review of that order, even absent express notice from the magistrate judge that failure to object within ten days will preclude appellate review.").

In his reply brief, Elliott does not appear to dispute that if Rule 72(a) applies, he has forfeited his right to appeal the magistrate judge's order.[3] Instead, Elliott argues that this case is governed by Federal Rule of Civil Procedure 73 and 28 U.S.C. § 636(c), which apply to consent proceedings before a magistrate judge and give the magistrate judge authority to conduct a civil action or proceeding and enter judgment, and allows a party to appeal a magistrate judge's

---

[3] Elliott briefly states that *Scott*'s waiver language is dicta because the court alternatively addressed the merits, but he does not explain how Rule 72(a)'s plain language would permit an appeal of the magistrate judge's order without an objection made to the district court.

judgment directly to the court of appeals. *See* 28 U.S.C. § 636(c)(1) ("Upon the consent of the parties, a . . . magistrate judge . . . may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves."); *id.* § 636(c)(3) ("Upon entry of judgment in any case referred under [§ 636(c)(1)], an aggrieved party may appeal directly to the appropriate United States court of appeals from the judgment of the magistrate judge in the same manner as an appeal from any other judgment of a district court."); Fed. R. Civ. P. 73(c) ("In accordance with 28 U.S.C. § 636(c)(3), an appeal from a judgment entered at a magistrate judge's direction may be taken to the court of appeals as would any other appeal from a district-court judgment."). There is no indication on the district court docket that the parties consented to the magistrate judge conducting the proceedings. *See* Fed. R. Civ. P. 73(b)(1) (providing that when parties consent to a magistrate judge conducting the proceeding, "[t]o signify their consent, the parties must jointly or separately file a statement consenting to the referral"). Further, the district judge—not the magistrate judge—ruled on the later motions for summary judgment, suggesting that the magistrate judge acted pursuant to Rule 72 when she disposed of the non-dispositive motion for leave to amend. Accordingly, Elliott's failure to object to the magistrate judge's order precludes him from "assign[ing] as error a defect in the order." Fed. R. Civ. P. 72(a). We therefore affirm the magistrate judge's grant of the Bank's motion for leave to amend.[4]

---

[4] We note that we find no abuse of discretion in the magistrate judge's granting the Bank's motion for leave to amend its answer. As the magistrate judge found, the claims asserted in the foreclosure action are not compulsory counterclaims in this action. *See Bauman v. Bank of Am., N.A.*, 808 F.3d 1097, 1101 (6th Cir. 2015) ("This Court has previously held that a counterclaim on the underlying debt in a Truth in Lending Act (TILA) action is permissive rather than compulsory." (citing *Maddox v. Ky. Fin. Co.*, 736 F.2d 380, 383 (6th Cir. 1984)). Additionally, the magistrate judge noted that no trial date had been set and found that reopening discovery was insufficient on its own to constitute sufficient prejudice to deny leave to amend. The magistrate judge also correctly found that the Bank satisfied the standard for amendment under Rule 15(a), which provides that "[t]he court should freely give leave when justice so requires."

**III.**

Elliott next argues that the district court erred in granting the Bank's motion for summary judgment. We review de novo a district court's grant of summary judgment. *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (citation omitted). Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *Baker*, 936 F.3d at 529 (citation omitted).

**A. TILA Claim**

Elliott argues that the district court erred in granting summary judgment to the Bank and denying his motion for summary judgment on his TILA claim. He asserts that the Bank violated the TILA and its regulations by failing to make a reasonable and good-faith determination that he had a reasonable ability to repay the 2014 loan based on verified documentation of his income. The reasonable-ability-to-repay provision at issue here was passed as part of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), Pub. L. No. 111–203, 124 Stat. 1376 (2010), which amended several sections of the TILA. Dodd-Frank was passed "in response to a 'financial crisis that nearly crippled the U.S. economy,'" which had as a "major cause" "the simple failure of federal regulators to stop abusive lending, particularly unsustainable home mortgage lending." *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1189 (9th Cir. 2018) (quoting S. Rep. No. 111-176, at 2, 15 (2010)).

The relevant statute, 15 U.S.C. § 1639c, provides in part:

> **(a) Ability to repay**
> **(1) In general**
> In accordance with regulations prescribed by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a reasonable and good faith determination based on verified and documented information that, at the

time the loan is consummated, the consumer has a reasonable ability to repay the loan, according to its terms, and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments.
. . . .
**(3) Basis for determination**
A determination under this subsection of a consumer's ability to repay a residential mortgage loan shall include consideration of the consumer's credit history, current income, expected income the consumer is reasonably assured of receiving, current obligations, debt-to-income ratio or the residual income the consumer will have after paying non-mortgage debt and mortgage-related obligations, employment status, and other financial resources other than the consumer's equity in the dwelling or real property that secures repayment of the loan. A creditor shall determine the ability of the consumer to repay using a payment schedule that fully amortizes the loan over the term of the loan.
**(4) Income verification**
A creditor making a residential mortgage loan shall verify amounts of income or assets that such creditor relies on to determine repayment ability, including expected income or assets, by reviewing the consumer's Internal Revenue Service Form W-2, tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets. In order to safeguard against fraudulent reporting, any consideration of a consumer's income history in making a determination under this subsection shall include the verification of such income by the use of--
> **(A)** Internal Revenue Service transcripts of tax returns; or
> **(B)** a method that quickly and effectively verifies income documentation by a third party subject to rules prescribed by the Bureau

15 U.S.C. § 1639c.

Consistent with the statute, the Consumer Financial Protection Bureau also promulgated regulations that contain more specific requirements, which are discussed in pertinent part below. The Bank concedes that the regulations are binding on it.

Elliott first argues that the spousal-support information in the application—listing spousal support at $2300 per month—was not documented or verified in violation of 15 U.S.C. § 1639c(a)(1) & (4), 12 C.F.R. § 1026.43(c)(2), (3) & (4), and "Appendix Q," 12 C.F.R. Pt. 1026, App. Q §§ I(A)(1), II(A). In particular, Elliott argues that the Bank failed to make a reasonable and good-faith determination that he could reasonably repay the loan "based on verified and documented information" "at the time the loan [was] consummated," 15 U.S.C. § 1639c(a)(1), that

it failed to "verify" the spousal support "using reasonably reliable third-party records," 12 C.F.R. § 1026.43(c)(2), (3) & (4), and that it failed to review "required documentation" including a "[l]egal separation agreement," 12 C.F.R. Pt. 1026, App. Q § II(A).  According to Elliott, the Bank violated the statute and regulations by failing to confirm the spousal-support income through review of the separation agreement—instead relying on statements made by Golan and Elliott.

The Bank does not dispute that it did not review the executed separation agreement at the time the loan was consummated.  Nor could it, because the separation agreement was not signed by both parties until early February 2015, nearly two months after the loan was finalized.  Instead, the Bank argues that it appropriately relied on the information available to it, including Golan's assurances that she and Elliott had agreed on spousal support and that she would follow through with her commitment to enter the separation agreement, and documentation that Golan would be able to make the spousal-support payments.  Further, the Bank notes that Golan and Elliott did, in fact, sign the separation agreement providing for sufficient spousal support for Elliott to pay his mortgage, and that Elliott would have continued to pay his mortgage had he not breached the separation agreement.  The Bank also argues that it complied with Appendix Q because, although Appendix Q generally requires a creditor to verify that spousal-support payments "have been received during the last 12 months" to include those payments in a consumer's income calculation, Appendix Q also authorizes a bank to rely on "evidence that [spousal support] payments have been received" for "[p]eriods less than 12 months . . . , provided the creditor can adequately document the payer's ability and willingness to make timely payments."  12 C.F.R. Pt. 1026, App. Q § II(A)(3).

The parties seem to assume that Appendix Q applies in this case.  However, it appears that Appendix Q only provides the standards to be used in determining monthly debt and income in

order for a mortgage to be considered a "qualified mortgage." *See* 12 C.F.R. § 1026.43(e)(2)(v)-(vi) (defining "qualified mortgage" in part as complying with Appendix Q); 12 C.F.R. Pt. 1026, App. Q ("Section 1026.43(e)(2)(vi) provides that, to satisfy the requirements for a qualified mortgage under § 1026.43(e)(2), the ratio of the consumer's total monthly debt payments to total monthly income at the time of consummation cannot exceed 43 percent. Section 1026.43(e)(2)(vi)(A) requires the creditor to calculate the ratio of the consumer's total monthly debt payments to total monthly income using the following standards, with additional requirements for calculating debt and income appearing in § 1026.43(e)(2)(vi)(B)."). A "qualified mortgage," under certain circumstances, results in either a conclusive or rebuttable presumption that the lender complied with the reasonable-ability-to-repay requirement. 12 C.F.R. § 1026.43(e)(1). The Bank did not argue in its briefing that the 2014 Loan constitutes a "qualified mortgage" or that the Bank was entitled to a presumption that it satisfied the reasonable-ability-to-pay requirement.

In any event, Appendix Q does not help the Bank because the Bank did not comply with it. Although a creditor may rely on "evidence that [spousal support] payments have been received" for "[p]eriods less than 12 months . . . , provided the creditor can adequately document the payer's ability and willingness to make timely payments," here, the Bank had no evidence of any spousal-support payments because Golan had not begun making them, and thus no evidence that any payments had been received "during the last 12 months." Further, Appendix Q requires that, for spousal support income to be considered effective, the consumer must provide required documentation. 12 C.F.R. Pt. 1026, App. Q § II(A)(2). Examples of required documentation include a final divorce decree, legal separation agreement, court order, or voluntary payment agreement. *Id.* Verbal assertions from Golan that she and Elliott would execute a separation agreement plainly do not comply with the rule.

The Bank also failed to comply with 12 C.F.R. § 1026.43, which allows a creditor to consider income or assets that are "current or reasonably expected" but requires the creditor in considering the income or assets to use "third-party records that provide reasonably reliable evidence of the consumer's income or assets." 12 C.F.R. § 1026.43(c)(2)(i), (c)(4); *see also id.* § 1026.43(c)(3) ("Verification using third-party records. A creditor must verify the information that the creditor relies on in determining a consumer's repayment ability under § 1026.43(c)(2) using reasonably reliable third-party records, except that . . . [f]or purposes of paragraph (c)(2)(i) of this section, a creditor must verify a consumer's income or assets that the creditor relies on in accordance with § 1026.43(c)(4)."). Under the regulation,

> [t]hird-party record means:
> (i) A document or other record prepared or reviewed by an appropriate person other than the consumer, the creditor, or the mortgage broker, as defined in § 1026.36(a)(2), or an agent of the creditor or mortgage broker;
> (ii) A copy of a tax return filed with the Internal Revenue Service or a State taxing authority;
> (iii) A record the creditor maintains for an account of the consumer held by the creditor; or
> (iv) If the consumer is an employee of the creditor or the mortgage broker, a document or other record maintained by the creditor or mortgage broker regarding the consumer's employment.

12 C.F.R. § 1026.43(b)(13). The Bank does not explain how it verified Elliott's spousal-support income with reliable third-party documents. The Bank instead argues that it "properly documented its file" because the file shows the meetings with Golan and reflects her assurances that she would enter a separation agreement. The Bank also notes that it requested a copy of the separation agreement. The summary of the meeting with Golan was prepared by Bank management and thus cannot constitute a third-party record. And the separation agreement was not executed until nearly two months after the loan was made, and therefore cannot constitute a third-party record that the Bank relied on to make a reasonable-ability-to-repay determination. Further, that the Bank requested a copy of the separation agreement suggests that it understood that it needed to verify

and document the spousal support with a reliable third-party document such as an executed separation agreement.

Elliott also argues that the Bank failed to properly document and verify rental income. Elliott points out that there was no documentation in the loan file to support his statement on the loan application that he was receiving rental income of $1400 per month, in violation of § 1639c(a)(1) & (4), 12 C.F.R. § 1026.43(c)(3) & (4), and Appendix Q. The Bank responds that Elliott was in fact receiving $1000 in rental income per month from his Maple Ridge Road property when the loan was approved, and that the Bank reviewed Elliott's tax returns showing previous rental income. The Bank, however, ignores that it did not review the lease; the rent Elliott was receiving was less than what he listed; and the rent listed on the 2013 tax returns was income from different properties and amounted to $712.50 gross income per month with a net annual loss of $1427. In short, in issuing the loan, the Bank relied on rental income of $1400 per month, but Elliott was only receiving $1000 per month, and it was through a lease agreement that the Bank did not verify prior to consummation of the loan.[5] Accordingly, the Bank did not comply with 12 C.F.R. §1026.43(c)(3) & (4) because it did not verify the listed rental income with any documents that establish that income.

To the extent Appendix Q applies, Appendix Q requires verification of rental income by reviewing current rental agreements and previous tax returns. 12 C.F.R. Pt. 1026, App. Q § II(D)(1) & (4). For roommates in a single-family property, Appendix Q requires the income to be shown on a tax return if it is to be used in qualifying. *Id.* § II(D)(3). The Bank did not comply

---

[5] The parties dispute whether the $1000 per month should be reduced due to the costs associated with maintaining the property, but resolution of this issue is not material to whether the Bank properly verified the rental income.

with these requirements to verify the income from the 2014 lease of the Maple Ridge Road property.

If rental income and spousal support are excluded from Elliott's income, Elliott's debt-to-income ratio would be over 90%. The Bank does not argue that a borrower with a debt-to-income ratio of over 90% would have a reasonable ability to repay the loan, or that it could reasonably so determine if spousal support and rental income were excluded. Rather, Murtiff's affidavit states that the Bank had a 40% threshold at the time of this loan. Thus, under the Bank's own standard, exclusion of the spousal support and rental income would result in a debt-to-income ratio that is too high to repay the loan.

Accordingly, the Bank violated 15 U.S.C. § 1639c and 12 C.F.R. § 1026.43 by considering spousal support and rental income that were not properly verified and documented in making its reasonable-ability-to-repay determination.

We acknowledge that the Bank's arguments are sympathetic. The Bank initially denied Elliott's application because it preferred to keep the loan as it was. It only changed course after meeting with Golan, a good client who, along with Elliott, was familiar with mortgage requirements and had never missed a payment. Golan stressed that it was important that Elliott stay in his family home and gave assurances that she would pay spousal support sufficient to cover the monthly mortgage payment. The Bank then closed the loan—which helped facilitate Golan and Elliott's separation plan—with minimal closing costs. The Bank also points out that the loan was a portfolio loan—the loan was designated to stay in-house and would not be sold on the secondary market—meaning this is not a situation where a bank approves a risky loan in order to collect the closing costs and then sells the loan, leaving another servicer to deal with the risk of default. *See* Dee Pridgen & Richard M. Alderman, Consumer Credit and the Law § 9A:1 ("All

too often [prior to Dodd-Frank], mortgage brokers would encourage consumers to take out loans based on the value of the collateral rather than the consumer's income or other resources. Mortgages could then be sold, the originator could collect their fees and let the consumer worry about making payments or suffer foreclosure."). Finally, the Bank's trust in Golan's representations were validated: Golan and Elliott executed a separation agreement providing that Golan would pay spousal support of approximately the amount listed in the loan application, and she paid that amount for several months. As the Bank argues, Elliott would still be receiving that money, and paying his mortgage, had he followed through with the separation agreement.

Although the Bank's arguments are sympathetic, they do not change the fact that technical violations of TILA generally result in liability. In a previous case, we addressed an argument by a creditor that a borrower cannot recover statutory damages under TILA where the borrower made fraudulent misrepresentations in obtaining the credit:

> Moreover, Eldridge points out that the TILA is a remedial statute which serves two purposes: (1) to permit an individual consumer to recover for her injuries; and (2) to deter socially undesirable lending practices. Eldridge contends that the congressional purpose would not be served by awarding Purtle any statutory damages because she admittedly suffered no damages, was never misled or confused by the credit agreement, and understood all of her credit terms. Furthermore, Eldridge contends that as a matter of public policy fraudulent conduct should not be condoned or encouraged nor should it serve as the basis for recovering damages. Therefore, Eldridge argues that Purtle is not entitled to recover statutory damages.
>
> On the other hand, Purtle argues that her alleged misrepresentations of her financial condition are no defense to Eldridge's violation of the TILA. The Fifth Circuit Court of Appeals has held that once a court finds a violation of the TILA, no matter how technical, the court has no discretion as to the imposition of civil liability. This Court agrees with the reasoning of the Fifth Circuit Court of Appeals in *Grant* [*v. Imperial Motors*, 539 F.2d 506 (5th Cir. 1976)]. According to that Court, "once the court finds a violation, no matter how technical, it has no discretion with respect to the imposition of liability." . . . .
>
> . . . The Eighth Circuit Court of Appeals has followed the same rule. Based on the unambiguous statutory language, it is clear that unless one of the defenses provided

> in the TILA is applicable to this transaction, the district court appropriately awarded Purtle the statutory penalty set out above.

*Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 801-02 (6th Cir. 1996) (citations omitted).

*Purtle* applied 15 U.S.C. § 1640(a), which is the same statute that provides liability for the TILA violation alleged here, although it has been amended and now provides:

> Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part . . . with respect to any person is liable to such person in an amount equal to the sum of--
> **(1)** any actual damage sustained by such person as a result of the failure;
> **(2)(A)** (i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, (ii) in the case of an individual action relating to a consumer lease under part E of this subchapter, 25 per centum of the total amount of monthly payments under the lease, except that the liability under this subparagraph shall not be less than $200 nor greater than $2,000, (iii) in the case of an individual action relating to an open end consumer credit plan that is not secured by real property or a dwelling, twice the amount of any finance charge in connection with the transaction, with a minimum of $500 and a maximum of $5,000, or such higher amount as may be appropriate in the case of an established pattern or practice of such failures; or (iv) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $400 or greater than $4,000;
> . . . .
> **(3)** in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 or 1638(e)(7) of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court; and
> **(4)** in the case of a failure to comply with . . . section 1639c(a) of this title, an amount equal to the sum of all finance charges and fees paid by the consumer, unless the creditor demonstrates that the failure to comply is not material.

Thus, other arguments the Bank raises that could be construed as defenses—e.g., that Elliott was aware that lenders relied on income stated in an application and yet lied about his income, or that the divorce court determined that Elliott's income was $5500 per month—are not defenses to liability in this case. *See* 15 U.S.C. § 1640(b), (c), (f), (l) (listing defenses such as correction of errors, bona fide errors, good-faith compliance with regulation or interpretation of the Bureau, or where the obligor is "convicted of obtaining by actual fraud such residential mortgage loan").

Accordingly, we reverse the grant of summary judgment to the Bank and reverse the denial of summary judgment to Elliott.

As for the amount of damages, the district court did not address the issue (because it found no violation) and the parties' briefing on appeal is insufficient to conclusively determine damages. We therefore leave it to the district court to determine damages in the first instance, either through supplemental summary-judgment briefing or a trial.

**B. Negligence Claim**

Elliott also argues that the district court erred in granting summary judgment to the Bank on his negligence claim. Elliott's negligence claim is a repackaging of his TILA claim, alleging that the Bank breached a duty of care owed to Elliott by approving the 2014 loan without a reasonable and good-faith determination that he had a reasonable ability to repay the loan and for failing to verify his stated income with documentation. "[T]he elements of an ordinary negligence suit between private parties are (1) the existence of a legal duty, (2) the defendant's breach of that duty, and (3) injury that is the proximate cause of the defendant's breach." *Wallace v. Ohio Dep't of Commerce*, 773 N.E.2d 1018, 1025-26 (Ohio 2002).

We agree with the district court that Elliott has not established that the Bank owed him a duty because Ohio law provides that lenders owe no duty to prospective borrowers during negotiations about terms and conditions of a loan. *Blon v. Bank One*, 519 N.E.2d 363, 368 (Ohio 1988) ("[A] bank and its customers stand at arm's length in negotiating terms and conditions of a loan." (citation omitted)); *see also Shaner v. United States*, 976 F.2d 990, 993 (6th Cir. 1992) ("[T]he borrower and lender stand at arm's length while negotiating the terms and conditions of the loan and no fiduciary duty exists at this stage of the relationship . . . ."); *Provident Bank v. Adriatic, Inc.*, 2005-Ohio-5774, ¶ 23 (Ohio Ct. App. Oct. 31, 2005) (unpublished) ("Appellants

cite to no authority for the proposition that a lender owes a borrower a duty of care in the context of negotiating a loan agreement.").

Elliott argues, however, that the duty the Bank owes is supplied by the TILA, 15 U.S.C. § 1639c(a)(1), which was enacted to protect borrowers like him, the housing market, and the public. Although Ohio generally recognizes that, "[w]here a legislative enactment imposes a specific duty for the safety of others, failure to perform that duty is negligence *per se*," *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 201 (Ohio 1998), Elliott does not cite, and we have not found, an Ohio case suggesting that a borrower can establish a negligence claim for a lender's technical violations of an income-verification statute where the lender relied on the borrower's own representations in approving the loan.[6] "'[W]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability, we should choose the narrower and more reasonable path.'" *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (second alteration in original) (quoting *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc)).

Accordingly, we affirm the district court's grant of summary judgment to the Bank on Elliott's negligence claim.

## C. Foreclosure

Elliott does not dispute that the Bank has made its affirmative case for foreclosure. Rather, Elliott argues that he has valid defenses to foreclosure: unclean hands, unconscionability, and recoupment or setoff.

---

[6] Elliott cites several cases, but none of them aid him here. *Childs v. Charske*, 822 N.E.2d 853 (Ohio Ct. Com. Pl 2004), is a trial court case involving misrepresentations by title companies. *Lewis v. Wall*, 2008-Ohio-3387 (Ohio Ct. App. July 3, 2008) (unpublished), is a landlord-tenant matter involving a slip and fall. *Daniels v. Select Portfolio Servicing, Inc.*, 201 Cal. Rptr. 3d 390 (Cal. App. 2016), has never been cited by an Ohio court and involved alleged misrepresentations in connection with a proposed loan modification.

"[I]t is fundamental that he who seeks equity must do equity, and that he must come into Court with clean hands." *Christman v. Christman*, 168 N.E.2d 153, 154 (Ohio 1960). For the Bank to be deemed to have unclean hands, Elliott must demonstrate that the Bank committed reprehensible conduct in regard to the subject matter of the suit. *Basil v. Vincello*, 553 N.E.2d 602, 607 (Ohio 1990).

Elliott argues that the Bank had unclean hands due to its predatory lending, including by approving a loan that Elliott had no possibility to repay and for taking advantage of Elliott's advanced age. He also argues that the Bank made the loan based solely on the collateral. The undisputed facts, however, do not rise to the level of unclean hands. Although the Bank may have failed to properly verify Elliott's income, Elliott himself signed an application confirming that the income he listed was accurate, and the Bank gathered and reviewed many standard loan-file documents, including tax returns and bank statements. Further, the Bank approved the financing that he requested to assist him and Golan in dividing their assets, and there is no evidence that the Bank took advantage of Elliott's age. Although Elliott appears to be having cognitive difficulties now, the Bank knew him as an experienced realtor knowledgeable about mortgage products.

Elliott also points to brief testimony from Savidge to suggest that the Bank approved the loan based solely on the collateral rather than an expectation that Elliott could repay the loan. That series of questions, however, was discussing whether Elliott's age was a factor in determining the terms to offer him:

> Q. What's the logic of extending a longer term to the borrower when the 80- year-old borrower is the one staying on the loan and the 50-some borrower is getting off the loan?
>
> A. I mean, I'm sure we presented the options of, you know, whether it's 25 or 20 or 15. Those would have been the portfolio choices, so ---
>
> Q. But he's not going to live that long, is he?
>
> MR. KOLMAN: Objection.

-20-

A. I would be discriminating against him if I based giving him a loan on his age and, you know, so, you know.

Q. So, in that situation, it's really a loan covered by collateral?

A. Correct. Age is irrelevant.

This brief testimony—where Savidge was explaining whether he considered Elliott's age in determining the terms to offer—does not support a finding that the Bank approved the loan so that it could take the property, as the remainder of Savidge's testimony detailed the efforts he made to determine that Elliott could repay the loan. Thus, although Elliott has cited no caselaw finding unclean hands even under the facts that he alleges, his version of events is unsupported by the record.

As to unconscionability, in addition to repeating some of the same arguments as above, Elliott argues that he has established the defense of unconscionability due to the Bank's predatory lending, including "mortgage flipping," and taking advantage of an elderly borrower in exchange for a promise of referrals by Golan.

"Unconscionability is a legal question involving an absence of choice on the part of one of the parties to a contract and contract terms that are unreasonably favorable to the other party. . . . In many cases the meaningfulness of the choice is negated by a gross inequality of bargaining power." *Swayne v. Beebles Invts., Inc.*, 891 N.E.2d 1216, 1222 (Ohio Ct. App. 2008). Ohio law also considers mortgage flipping to be an unconscionable act. "Flipping" a mortgage is defined as "making a mortgage loan that refinances an existing mortgage loan when the new loan does not have reasonable, tangible net benefit to the consumer considering all of the circumstances, including the terms of both the new and refinanced loans, the cost of the new loan, and the consumer's circumstances." Ohio Rev. Code Ann. § 1345.031(B)(12). Elliott argues that the Bank engaged in mortgage flipping when the 2013 Loan was refinanced with the 2014 Loan, pointing out that the 2014 Loan had a higher interest rate. He also suggests that the Bank knew he

could not repay the 2014 Loan and instead intended to take the property and gain favor with Golan, a potential source of referrals. He claims that these actions are also unconscionable under Ohio Revised Code Annotated § 1345.031(B)(2), which makes unconscionable "[e]ngaging in a pattern or practice of providing consumer transactions to consumers based predominantly on the supplier's realization of the foreclosure or liquidation value of the consumer's collateral without regard to the consumer's ability to repay the loan in accordance with its terms."

Elliott relies on *Swayne* in arguing that he has a valid defense of unconscionability. *Swayne* involved a senior citizen who lived off of $1206 per month. 891 N.E.2d at 1219. She owned her home free and clear of any liens or mortgages but needed money for repairs, so she approached a small company in hopes of borrowing funds because her credit score was too low to obtain financing from most lenders. *Id.* at 1219-20. The court explained that Swayne had met her burden to establish unconscionability under the egregious facts of that case:

> Here, Swayne was in her 70s when she engaged in this transaction. She had not worked outside the home since 1972. Her husband, who had managed the couple's finances, had died two years before. Swayne soon found herself in need of money to pay bills and to repair the roof, kitchen, and bathroom of her home of 20 years. For help, she contacted a company that listed itself as A–Loan. Beebles does business under the name of A–Loan.
>
> Swayne did not seek the help of a lawyer or even of a financially sophisticated friend. She stated that she relied upon the representations of a loan officer for Beebles and upon the representations of Timothy Farkas personally in deciding to go forward with the mortgage. On July 10, 2002, she executed a note and a mortgage. The mortgage is 12 pages of single-spaced type. In addition, there is a two-page Balloon Rider (Conditional Right to Refinance). The interest on the balloon note is listed at 24.990 percent, but the federal Truth–in–Lending Disclosure lists the annual percentage rate as 41.657 percent, with a final balloon payment of $25,612.11 due on August 1, 2003. The interest rate alone clearly favors the lender.
>
> Of the $20,000 face amount of the note, Swayne received $13,734.60. This demonstrates that approximately 31 percent of the loan's proceeds were allocated to closing costs and fees. As indicated earlier, Beebles received a $1,000 loan origination fee, a $1,000 loan discount fee, a $75 processing fee, and a $50 payment

purportedly to reimburse the costs for a credit report. In addition to state and federal statutes that prohibit some of these provisions, these numbers, on their face, are one-sided in favor of Beebles.

Beebles knew that with a monthly income of $1,206, Swayne would be unable to make the balloon payment when it became due. Thus, Beebles placed Swayne in a position in which Beebles knew or should have known that Swayne was certain to default. All of these factors demonstrate substantive unconscionability.

With respect to procedural unconscionability, the relative bargaining positions of the parties could not be more disparate. Beebles and Farkas were in the business of brokering mortgages. Beebles took advantage of Swayne's lack of financial sophistication by having Swayne execute two sets of loan documents with differing terms. Swayne was unfamiliar with financial matters, as she was a recent widow whose husband had managed the couple's finances. Swayne did not consult a lawyer or even a financially sophisticated friend. Rather, she relied upon the representations of the loan officer, and then Farkas himself.

Farkas, on the other hand, knew the poor state of Swayne's finances, knew of her bad credit, knew of her lack of resources, knew that no lenders were willing to lend her money, and knew that Swayne could not possibly pay back the balloon note. He also testified that even with the loan, there was "no way" that Swayne had enough money to do the necessary repairs to her house. Despite all of that knowledge, appellants entered into a loan agreement with terms that Swayne could not possibly meet. On these undisputed facts, Farkas and Beebles took advantage of the parties' unequal bargaining positions to create a one-sided agreement in their favor.

*Id.* at 1222-23.

The facts in *Swayne* do not resemble this case. Here, the 2014 Loan, although it had a slightly higher interest rate than the 2013 Loan, had a far lower interest rate than in *Swayne*, and the terms of the loan actually lowered Elliott's monthly payments. *See Deutsche Bank Nat'l Tr. Co. v. Pevarski*, 932 N.E.2d 887, 896-98 (Ohio Ct. App. 2010) ("In the present case, an interest rate of 6.3 percent or 11.125 percent is also not, in and of itself, so extreme as to appear unconscionable."). Further, the 2014 Loan was issued at Elliott's and Golan's request to facilitate

their separation, not as a plot between Golan and the Bank to saddle Elliott with debt.[7]  Elliott is

an experienced real estate agent familiar with mortgage products who could have chosen not to

voluntarily divide the properties in the way that he and Golan did.  Further, unlike *Swayne*, where

the plaintiff had no possibility of ever making the balloon payment, Elliott would likely still be

current with his mortgage payments had he continued to abide by the terms of the separation

agreement.

Accordingly, there is no genuine dispute of material fact regarding Elliott's defenses of

unclean hands and unconscionability.

Finally, regarding recoupment and setoff, 15 U.S.C. § 1640(k) provides:

**(k) Defense to foreclosure**
**(1) In general**
Notwithstanding any other provision of law, when a creditor, assignee, or other holder of a residential mortgage loan or anyone acting on behalf of such creditor, assignee, or holder, initiates a judicial or nonjudicial foreclosure of the residential mortgage loan, or any other action to collect the debt in connection with such loan, a consumer may assert a violation by a creditor of paragraph (1) or (2) of section 1639b(c) of this title, or of section 1639c(a) of this title, as a matter of defense by recoupment or set off without regard for the time limit on a private action for damages under subsection (e).
**(2) Amount of recoupment or setoff**
  **(A) In general**
  The amount of recoupment or set-off under paragraph (1) shall equal the amount to which the consumer would be entitled under subsection (a) for damages for a valid claim brought in an original action against the creditor, plus the costs to the consumer of the action, including a reasonable attorney's fee.

Recoupment or setoff is "a matter of *defense*" to foreclosure, and recovery is limited to

"the amount to which the consumer *would be entitled* under [§ 1640(a)] for damages for a valid

claim brought in an original action against the creditor."  15 U.S.C. § 1640(k)(1) & (2) (emphasis

---

[7] Although Elliott repeatedly suggests that Golan was controlling his every move and that he applied for the 2014 Loan thinking that they would stay together, it is not clear why that would result in liability for the Bank where there is no evidence that the Bank was aware of Golan's alleged manipulation.

added). Here, though, Elliott brought an original action for violations of the TILA against the Bank. He is already entitled to seek damages under § 1640(a). By § 1640(k)'s own terms, he cannot obtain double damages for TILA violations through recoupment or setoff; however, he can offset his recovery against the foreclosure amount. As discussed above, the district court should determine in the first instance the amount to which Elliott is entitled under § 1640(a) directly.

## IV.

For the reasons set out above, we affirm the district court's grant of summary judgment as to the negligence claim, reverse the grant of summary judgment to the Bank on the TILA claim, reverse the denial of summary judgment to Elliott on the TILA claim, and remand for further proceedings consistent with this opinion.